Edward A. **KLOSTERMAN** and Debbie A. **Klosterman**, Plaintiffs,

v.

**WESTERN GENERAL MANAGEMENT, INC., a Delaware corporation and Guarantee Mutual Life Company, Nebraska corporation, Defendants.**

**No. 91 C 5015.**

United States District Court, N.D. Illinois, E.D.

Aug. 14, 1992.

John Robert Doyle, Michael David Phillips, McDermott, Will & Emery, P.C., Chicago, Ill., for Edward A. and Debbie Klosterman.

Howard Dale Lieberman, Barry D. Weiss, Kenneth M. Brown, Neal, Gerber & Eisenberg, Chicago, Ill., for Western General Management, Inc.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiffs Edward A. Klosterman and Debbie A. Klosterman, as parents and next friends of Brent E. Klosterman ("Klostermans") filed suit in the Illinois Circuit Court of DuPage County against defendants Western General Management, Inc. ("Western General") and Guarantee Mutual Life Company ("Guarantee Mutual"), alleging several violations of state common law in regard to health care coverage. Defendants petitioned to remove the action to a federal forum on the grounds that plaintiffs' claims were governed by the Employment Retirement Income Security Act of 1974 ("ERISA"). Defendants now move to dismiss the action on the grounds that they are improper defendants. For the following reasons we grant defendants' motion in part and deny it in part.

## BACKGROUND

Edward Klosterman was employed by Prairie Maize Company ("Prairie Maize"), an Ohio popcorn processor, from November 1989 to August 20, 1990. During his employment Mr. Klosterman and his eligible dependents participated in the Prairie Maize Company employee Health Benefit Plan ("the Plan"). The Plan was self-funded. Guarantee Mutual contracted with Prairie Maize to be the excess insurer for employee claims over $10,000. Guarantee Mutual also agreed to provide conversion coverage to eligible participants whose employment had terminated. Sharon Baldinger, manager of Prairie Maize Human Resources, was listed as the plan administrator. Western General, the publisher of the summary plan description ("SPD"), was listed as third party administrator with the responsibility of determining, with the assistance of the plan administrator, the benefit eligibility of individual claimants.

On August 29, 1990, following Mr. Klosterman's termination, Prairie Maize notified him that he could receive continued medical coverage, as provided by the Plan and guaranteed under the Consolidated Omnibus Budget Reconciliation Act (COBRA), for a premium of $315.84 per month. Thereafter, Mr. Klosterman submitted three checks to Prairie Maize to cover COBRA insurance for the months of September, October, and November.

On November 7, 1990, Brent Klosterman was admitted to Children's Memorial Hos-

pital in Chicago. That same day Sharon Baldinger sent a letter to Western General, informing them that due to the layoff of all its employees Prairie Maize was cancelling the Plan effective October 31, 1990, and that Banc Ohio had assumed the company's assets. Ms. Baldinger told Western General to process claims throughout the month of November. On November 8, Brent Klosterman was diagnosed with leukemia. That same day Mrs. Klosterman telephoned Western General to confirm that Brent's treatment would be covered. She was told that it would be and that no pre-admission evaluation would be necessary. On November 12, the Klostermans were informed that they were no longer covered by the Plan.

The following day, Mr. Klosterman applied for conversion coverage. The application, which was sign by Ms. Baldinger, stated that the reason coverage had terminated was that the Plan had terminated on October 31, 1990. The application also stated that conversion coverage was contingent on Guarantee Mutual's acceptance of the attached premium. The check, post-dated November 30, was made payable to Western General in the amount of $3,293.75. Western General returned the check, uncashed, to plaintiffs on December 3, 1990, after it was rejected by Guarantee Mutual.

The Klostermans filed suit in state court against Western General and Guarantee Mutual. The complaint seeks declaratory relief and damages under state common law. Counts I and II allege essentially the same thing, that defendants, by denying conversion coverage, breached their obligation under the Plan to make available conversion coverage when group coverage terminates. Plaintiffs assert that the SPD does not inform participants that the conversion coverage would be unavailable if the Plan terminates. Count III alleges fraud by Western General when it informed Mrs. Klosterman on November 8, 1990, that her son was insured. Count IV alleges intentional infliction of emotional distress for extreme and outrageous conduct on the part of defendants. Count V charges breach of covenant to act in good faith and deal fairly.

Defendants filed a motion pursuant to 28 U.S.C. § 1441 to remove the case to federal court on the grounds that plaintiffs' allegations "relate to" an employee benefit plan under 29 U.S.C. § 1001[1] and thus are preempted by ERISA. Defendants further assert that they are neither plan administrators nor fiduciaries under ERISA and, therefore, not amenable to suit. Plaintiffs contend that even if their claims are preempted by ERISA, defendants can be properly sued. All parties agree that plaintiffs have not exhausted their internal remedies as required by the Plan. Defendants argue for dismissal on this ground, while the Klostermans urge that we waive the requirement.

## DISCUSSION

### A. *Preemption*

■ By enacting ERISA, Congress intended to

protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).

To ensure uniformity in the law, Congress decided to insulate ERISA–related adjudication from state laws. To this end, § 1144(a), the preemption clause, was enacted. It provides:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chap-

---

1. Unless otherwise provided, all statutory cites are to Volume 29 of the United States Code (U.S.C.).

ter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (emphasis added).

Also, § 1132(a) provides a comprehensive civil enforcement scheme which allows a participant, beneficiary, or fiduciary to bring an action seeking a variety of relief.[2] The Supreme Court has interpreted the level of detail contained in § 1132 as evidence that Congress intended the federal remedy to be exclusive. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987) ("The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.")

The only exception to preemption is found in the savings clause, § 1144(b)(2)(A), which exempts state laws that "regulate[ ] insurance, banking, or securities." In other words, a state law that regulates insurance will not be preempted even though it is "related to" an employee benefit plan. However, a state law that purports to come within the purview of the savings clause may not deem an employee benefit plan to be "an insurance company or other insurer, bank, trust company ..." 29 U.S.C. § 1144(b)(2)(B).

Defendants argue that all of plaintiffs' state law claims are preempted by ERISA. Plaintiffs' response is not that their claims fall within the savings clause of § 1144(b)(2)(A) but instead that the conversion policy is not "related to" the Prairie

Maize employee benefit plan and thus not governed by ERISA. We disagree.

In *Pilot Life*, the Court discussed the scope of the phrase "relate to." After first noting that Congress intended the preemption provision "to apply in its broadest sense to all actions of State or local governments," *id.* at 46, 107 S.Ct. at 1552 (citing 120 Cong.Rec. 29933 (1974)), the Court explained that the phrase "relate to" should be given its "broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Pilot Life*, 481 U.S. at 47, 107 S.Ct. at 1553 (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). Therefore, by using a "common-sense" view we must consider whether the conversion policy provision had a "connection with" or contained a "reference to" an employee benefit plan.

The relevant provision in the SPD is found at page 39. It provides:

When a Covered Person's coverage under this Plan terminates under the conditions explained in this section, such Covered Person may obtain medical care conversion coverage without evidence of insurability. The Covered Person must have been covered by the Plan for at least 6 consecutive months just before coverage under this Plan terminated. These 6 months will be considered to include the time the Covered Person was covered for group medical care under both this Plan and the one it replaced, if any.

The conversion provision goes on to explain its availability to the spouse and children of a terminated employee.

By the language of the SPD only a person covered under "this Plan" may exercise

---

**2.** Section 1132(a) provides in part:

A civil action may be brought

  (1) by a participant or beneficiary

   (A) * * *

   (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

  (2) * * *

  (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

   * * * * * *

29 U.S.C. § 1132(a).

the conversion privilege. In other words, the option to convert exists only as part of the Plan. In fact, in plaintiffs' brief they describe the conversion provision as "provid[ing] the vehicle" to exercise the conversion privilege. Unquestionably, the conversion provision, by direct express reference, is "in connection with" the Plan. We are satisfied that this type of relationship between conversion coverage and the Plan comes within the occupied field of ERISA legislation. *See Howard v. Gleason Corp.,* 901 F.2d 1154 (2d Cir.1990) (New York law, which prescribed notice requirement to be given by employer to employee concerning conversion from group to individual life insurance upon termination, preempted by ERISA); *Rasmussen v. Metropolitan Life Ins. Co.,* 675 F.Supp. 1497, 1506 (W.D.La. 1987) ("plaintiffs' right to the converted policy ... existed solely by virtue of an ERISA employee health benefit plan.").

Plaintiffs, in an attempt to buttress their position, supplemented their brief with copies of several opinions. Among them is *International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294 (6th Cir. 1991), which held that a Kentucky statute, requiring substantially similar insurance policies be issued by successor insurers, was a regulation of insurance and thus not preempted pursuant to the savings clause. In *International Resources,* the plaintiff argued that a conversion policy issued by New York Life, the successor insurer, did not conform to the Kentucky statute. We find *International Resources* unavailing for several reasons.

First, as stated earlier, the Klostermans have not argued, and rightfully so, that their state law claims come within the savings clause of ERISA. Presumably the parties in *International Resources* agreed, at least impliedly, that the Kentucky statute was "related to" the employee benefit plan, as this premise is necessary before considering the applicability of the savings clause. Second, unlike the state statute at issue in *International Resources,* the Klostermans rely on general garden variety common law theories. These theories are not specifically directed at the insurance industry, as contemplated by the "savings clause." *See Pilot Life,* 481 U.S. at 50, 107 S.Ct. at 1554. Third, the court in *International Resources* stated that "we cannot fairly assume the activity Kentucky is regulating through its conversion statute is protected or guaranteed by an ERISA remedy." *Id.* at 301. The court reasoned that, unlike *Pilot Life* and *Ingersoll–Rand [Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)], where the Supreme Court found conflicting state law and ERISA provisions, the Kentucky statute presented no conflict with ERISA and, therefore, the law survived preemption.

For reasons unknown, the court in *International Resources* did not discuss §§ 1161–1167, which set forth the plan sponsor's obligation to provide continuation and conversion coverage for qualified beneficiaries once coverage under the plan has terminated.[3] The Supreme Court has made clear that the savings clause will be of little consequence when a state law conflicts with a particular substantive provision of ERISA. *Pilot,* 481 U.S. at 57, 107 S.Ct. at 1558. *See also Tingey v. Pixley–Richards West, Inc.,* 953 F.2d 1124, 1133 (9th Cir. 1992) ("In light of the attention Congress has given to the question of conversion rights for health benefits, we hold *Pilot Life* and *Ingersoll–Rand* require that these rights and the remedies for breaches thereof be exclusively those found in ERISA."). Accordingly, we hold that plaintiffs' state law claims are preempted by ERISA.[4]

B. *Exhaustion of Administrative Remedies*

■ The next question we must address is whether plaintiffs are precluded from

---

3. Of particular relevance is the Conversion option provision which provides:

    In the case of a qualified beneficiary whose period of continuation coverage expires under paragraph (2)(A), the plan must, during the 180–day period ending on such expiration date, provide to the qualified beneficiary the option of enrollment under a conversion health plan otherwise generally available under the plan.
    29 U.S.C. § 1162(5).

4. To avoid having plaintiffs replead under ERISA, we now read their complaint as being federal in character. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–67, 107 S.Ct. 1542, 1546–48, 95 L.Ed.2d 55 (1987).

seeking a judicial remedy for failure to exhaust their internal remedies. The SPD provides at page 46:

> LEGAL ACTION. Legal action to recover any lost benefits under this Plan may not be brought:
>> (1) until the Plan's appeal procedure, including utilization of a professional/peer review committee, has been exhausted per the terms of ERISA ... or
>> (2) later than three (3) years after the expense/disability was incurred.

In *Kross v. Western Elec. Co., Inc.*, 701 F.2d 1238 (7th Cir.1983), the court stated that "application of the exhaustion doctrine ... is a matter within the discretion of the trial court," *id.* at 1244, "and that as a matter of sound policy [the court] should usually [apply it]." *Id.* at 1245 (quoting *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir.1980)). Courts will not apply the doctrine, however, if pursuing internal procedures would yield an inadequate remedy or if such effort would be a futile gesture. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 466 (7th Cir.1986).

In the present case we decline to apply the exhaustion doctrine because requiring the Klostermans to pursue the internal procedures set out in the SPD would be an exercise in futility. The record indicates that effective October 31, 1990, Prairie Maize ceased all operation, laid off all its employees, and had its assets assumed by Banc Ohio. No claims were processed beyond November 1990. Therefore, plaintiffs had no internal avenues available. Defendants have not come forward with any evidence or argument to persuade us otherwise.

## C. *Guarantee Mutual as a Proper Party*

■ We now consider whether Guarantee Mutual can be dismissed from this action as a matter of law. We hold that it can. Plaintiffs charge that Guarantee Mutual was a fiduciary of the conversion option and, therefore, an action against it is proper under ERISA. Plaintiffs also allege that Guarantee Mutual is estopped from denying conversion coverage due to Guarantee's "promise" to provide such coverage.

A fiduciary with respect to a plan is defined as someone who

> exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... [or someone who has] any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

It is not disputed that Guarantee Mutual exercised discretion once a conversion policy was issued, but whether the conversion policy can be considered a "plan," and Guarantee Mutual a fiduciary of that plan, is far from clear. However, the answer is not necessary to our disposition of this matter. Even assuming Guarantee Mutual was a fiduciary for purposes of § 1002(21)(A), any duty it might have had to provide conversion coverage to plaintiffs ended on October 30, 1990, the date Prairie Maize ceased active business operations. The Adoption and Participation Agreement, in which only Prairie Maize and Guarantee Mutual were parties, sets forth the eligibility requirements for employees. It states, in the "Termination" section, that "The Employer will cease to participate in this Plan and any right to become insured for medical care conversion insurance under this Plan terminates as to its employees (and their dependents) on the date the Employer: (1) suspends active business operations or is placed in bankruptcy...." Therefore, once the underlying plan was terminated Guarantee Mutual was not obligated to provide plaintiffs, or any other Prairie Maize employees, with conversion coverage.

Also, plaintiffs' estoppel theory fails. If estoppel is a viable theory in the instant case, at a minimum it will require a showing that Guarantee Mutual made a misleading representation in which plaintiffs reasonably and detrimentally relied. *See Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990). Simply put, Guarantee Mutual, as a matter of law, never

made a representation, much less a misleading one, to plaintiffs. The insurer agreed with Prairie Maize to provide conversion coverage to participants so long as Prairie Maize remained in business. Therefore, Guarantee Mutual can be properly dismissed from this action.

### D. *Western General as a Proper Party*

 We next consider whether Western General is a proper defendant. Plaintiffs claim Western General was a plan administrator and/or fiduciary of the Plan. Therefore, plaintiffs argue, Western General is liable for not informing plan participants, through the SPD, that conversion coverage would terminate once the Plan terminated, in violation of ERISA's disclosure requirement.[5] Plaintiffs also contend that Western General is estopped from denying coverage based on its representative's statement to Mrs. Klosterman that Brent Klosterman was in fact insured. Western General, on the other hand, argues that as a third party administrator it owes no duty to provide conversion benefits.

> The SPD provides the following:
> The Plan Administrator is responsible for the administration of the Plan. Functions performed by the Plan administrator include: the receipt and deposit of contributions, maintenance of records of the Plan participants, authorization and payment of Plan administration expenses, selection of consultants, selection of Third Party Administrator and *assisting the Third Party Administrator with the determination of the eligibility of individual claimants for receipts of benefits* ... The Plan is administered by the Plan Administrator with Western General Services a Third Party Administrator acting as claims paying agent.

SPD at 42 (emphasis added). This language strongly suggests that Western General had responsibility—perhaps primary responsibility—for determining who got paid what and how much. The fact that Western General published the SPD only supports this suggestion. Although Sharon Baldinger is listed as the Plan Administrator, the question of whether Western General is a fiduciary under § 1002(21)(A) is still very much at issue. As mentioned earlier, one qualifies as a fiduciary if he or she has any discretionary authority, control, or responsibility over plan assets or with respect to the administration of plan. *See* 29 U.S.C. § 1002(21)(A). Viewing the facts in the light most favorable to plaintiffs, which we must do at this stage of litigation, *see Mosley v. Klincar*, 947 F.2d 1338, 1339 (7th Cir.1991), we cannot say that Western General is an improper defendant.[6] The Klostermans' theories of recovery against Western General remain viable.

### CONCLUSION

For the reasons stated above, we grant defendants' motion to dismiss with respect to Guarantee Mutual and deny their motion to dismiss with respect to Western General.

---

**5.** ERISA requires that the summary plan description inform participants of, among other things, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits ..." 29 U.S.C. § 1022(b).

**6.** Neither party has come forward with much detail regarding the service that Western General performed as third party administrator. Nevertheless, if plaintiffs can ultimately establish that Western General is in fact a fiduciary, then exactly what duty Western General owes plaintiffs under § 1022(b)'s disclosure will have to be determined.