**Ronald A. REYNOLDS, Plaintiff,**

v.

**MASSACHUSETTS CASUALTY INSURANCE COMPANY and Joseph P. Cofer, Jr., Defendants.**

**MASSACHUSETTS CASUALTY INSURANCE COMPANY, Plaintiff,**

v.

**Ronald A. REYNOLDS and Joseph P. Cofer, Jr., Defendants.**

Nos. 1:95–CV–160, 1:94–CV–194.

United States District Court,
E.D. Tennessee.

Sept. 1, 1995.

Hugh P. Garner, Garner, Lewis & Prickett, Chattanooga, TN, for Ronald A. Reynolds.

Shelby R. Grubbs, James T. Williams, IV, Miller & Martin, Chattanooga, TN, for Massachusetts Casualty Insurance Company.

Thomas Crutchfield, Crutchfield and Solomon, Chattanooga, TN, for Joseph P. Cofer, Jr.

## MEMORANDUM

COLLIER, District Judge.

This matter is before the Court upon the following motions:

1. Motion of Ronald A. Reynolds ("Reynolds") to dismiss (Court File No. 14) (No. 94–194);

2. Motion of Massachusetts Casualty Insurance Company ("Massachusetts Casualty") for summary judgment (Court File No. 16) (No. 94–194);

3. Motion of Mr. Reynolds to remand (Court File No. 2) (No. 95–160); and

4. Motion of Massachusetts Casualty for summary judgment (Court File No. 7) (No. 95–160).

For the reasons set forth herein, Mr. Reynolds' motions will be **DENIED** and the motions of Massachusetts Casualty will be **GRANTED.**

## I. BACKGROUND

In 1989, Mr. Reynolds was employed as the accountant/bookkeeper [1] of the Navarre Company, a private investment company that employed a total of five to six people during the relevant time period. During the course of his employment, the Navarre Company purchased disability insurance through Mr. Joseph P. Cofer, Jr. ("Cofer"), an insurance agent, from Massachusetts Casualty. Mr. Reynolds, as comptroller of the company,

---

1. Upon the death of the company's founder and subsequent changeover to a partnership, Mr. Reynolds' job title changed to controller/office manager with business management functions. (Court File No. 34, Exhibit 2 at 11–12)

"was responsible for 'managing' the office and its various accounting functions" (Court file No. 17, Appendix at 376), and was assigned to investigate the possibility of changing the company's group health insurance coverage. (Court File No. 20, Affidavit of Mary N. Bailey at ¶ 5; Court File No. 34, Exhibit 1, Affidavit of Ronald A. Reynolds at ¶ 2–4). Mr. Reynolds had discussions with Mr. Cofer and recommended Cofer and Massachusetts Casualty to his superior. The insurance was for the Navarre Company's employees as part of an employer-sponsored benefit program. For so long as the employee remained, the Navarre Company would pay the premiums due to Massachusetts Casualty for the disability coverage. Upon termination, the employee was given the opportunity to continue coverage and assume responsibility for premium payments.

Under this employer-sponsored benefit program, on or about October 17, 1989, Mr. Reynolds executed an Application for Disability Insurance with Massachusetts Casualty (Court File No. 1, Exhibit A). The application executed by Mr. Reynolds did not disclose his prior and existing medical conditions and treatments,[2] including Meniere's Syndrome.[3] In particular, the signed application form was completed as follows:

| | | |
|---|---|---|
| (a)(1) | Do you have any impairment or deformity? | No. |
| (b)(1) | Do you take any type of prescribed medication? | No. |
| (c) | To the best of your knowledge and belief, have you ever had or been under treatment for any injury, disease or disorder? | |
| (1) | Of the audio-optic system (such as cataracts, glaucoma, impaired vision not correctable by glasses, impaired hearing or mastoiditis)? | No. |
| (5) | Of the musculo-skeletal system (such as arthritis, back trouble, deformity, rheumatism, sciatica, spine trouble or any | |

| | | |
|---|---|---|
| | condition resulting from bodily injury)? | No. |
| (6) | Of the nervous system (such as alcoholism, convulsions, drug addiction, epilepsy, loss of consciousness, neuritis, paralysis or any mental or nervous trouble)? | No. |
| (9) | Of any illnesses, impairments, injuries or symptoms, within the last five (5) years, not already mentioned? | No. |
| (d)(3) | Have you consulted a physician, surgeon or practitioner during the last five (5) years? | No. |

Reynolds alleges he had numerous telephone conversations and meetings with Cofer concerning the specifics of his health information. Reynolds further alleges at the time he signed the application he believed it to be only a one-page enrollment or changeover form, not an application. (Court File No. 17, Appendix at 379–380) (Court File No. 34, Exhibit 1, Affidavit of Reynolds at ¶ 11, 12, 13).

Effective January 1, 1990, Massachusetts Casualty issued policy number 0448154 to defendant Reynolds (Court File No. 1, Exhibit B). The policy provides in pertinent part:

## PART XIV

### EXCLUSIONS OR LIMITATIONS

This Policy does not cover any loss excluded: (1) by name or description in any elimination rider attached to this Policy; or (2) under the Provision which follows.

(Pre-existing Condition Limitation): No benefits are payable for a loss which: (1) starts within 2 years after the effective date of coverage of this Policy; and (2) results from a pre-existing condition not fully disclosed in your application for this Policy. Pre-existing condition means: (1) a condition for which medical advice or treatment was received from or recommended by a physician within 5 years prior

---

**2.** Mr. Reynolds had been examined by several doctors prior to the date of the application. Many of these doctors were seen because of health problems Mr. Reynolds was experiencing. (Court File No. 17, Appendix at 360–375).

**3.** Meniere's Syndrome is a disorder characterized by hearing loss, dizziness, blackouts and nausea. (Court File No. 17, Appendix at 381). Mr. Reynolds was diagnosed as suffering from this illness at least as early as the 1970's. (Court File No. 17, Appendix at 67, 360–75).

to the effective date of coverage of this Policy; or (2) the existence of symptoms within said 5 years which would have led an ordinarily prudent person to seek medical advice or treatment for this condition. (Court File No. 1, Exhibit B).

The policy was amended, prior to issuance, as follows:

1. GENERAL PROVISION 2: "INCONTESTABLE": is deleted in total and replaced by that shown below.

2. TIME LIMIT ON CERTAIN DEFENSES: (A) After two years from the date of issue of the Policy no misstatements, *except fraudulent misstatements, made by you in the application* for this Policy shall be used to void the Policy or to deny a claim for loss incurred or disability; as defined in the Policy; commencing after the expiration of such two-year period. (B) No claim for loss incurred or disability; as defined in the Policy; commencing after two years from the date of issue of this Policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this Policy.

(Court File No. 17, Appendix at 11) (emphasis added).

From January 1990 to April 1992, the Navarre Company paid the necessary premiums for its employee, Mr. Reynolds. On April 10, 1992, Mr. Reynolds' employment was terminated. However, Mr. Reynolds exercised his right under the plan and opted to continue his disability coverage with Massachusetts Casualty and assumed responsibility for the payment of premiums in May and June of 1992 for the policy. On or about May 31, 1992, Mr. Reynolds filed a proof of loss claiming total disability and seeking benefits under the policy. For the months of June, July and August of 1992, Massachusetts Casualty paid monthly benefits to Mr. Reyn-

olds, with full reservation of rights, totaling $9,900.00. Following its own investigation, though, Massachusetts Casualty discovered the extent of Mr. Reynolds' prior and existing medical condition. By letter dated September 15, 1992, Massachusetts Casualty denied the claims of Mr. Reynolds and rescinded coverage of the policy, claiming he had fraudulently misrepresented his past and present medical condition by omitting any reference to his medical history and treatment in his application. (Court File No. 17, Appendix at 84–86.)

On May 24, 1993, Mr. Reynolds filed suit against Massachusetts Casualty and Mr. Cofer in the Circuit Court of Hamilton County (Court File No. 42, Exhibit A). He alleged Mr. Cofer knew of his health history and completed the application as the agent of Massachusetts Casualty, thus making Massachusetts Casualty liable for claims under the disability policy.[4] On June 9, 1994, Massachusetts Casualty filed for declaratory judgment concerning its liability under the disability policy (No. 94–194). Massachusetts Casualty asserted the case involved the application of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* (Court File No. 1).

## II. DISCUSSION

### A. Standard of Review

■ Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir.1993). The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden of

---

4. Mr. Reynolds filed a voluntary dismissal of the state court action pursuant to Tenn.R.Civ.P. 41.01. However, he thereafter filed a substantially similar action on May 2, 1995, which was subsequently removed to this Court on May 15, 1995, by Massachusetts Casualty. *See* 95–CV–

190. The Court has denied Reynolds' motion to remand that action back to state court and has consolidated the two pending federal proceedings for purposes of discovery and trial. (Court File No. 45)

production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *LaPointe,* 8 F.3d at 378. The mere existence of a scintilla of evidence to support a party's position will be insufficient; there must be evidence on which the jury could reasonably find for the party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), on the other hand, requires the court to construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 475 (6th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990). A complaint need only give "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Lawler v. Marshall,* 898 F.2d 1196, 1199 (6th Cir.1990) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). A judge may not grant a Fed.R.Civ.P. 12(b)(6) motion to dismiss based on a disbelief of a complaint's factual allegations. *Id.* While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). "In practice, 'a … complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *Id.* (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) (quoting *In re Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir.1981))).

**B. *ERISA Preemption***

ERISA Section 514(a), 29 U.S.C. § 1144(a), provides:

Except as provided in [the savings clause], the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan [covered by ERISA].

While ERISA's preemption provision is "conspicuous for its breadth," *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990), state laws that affect plans in only a "tenuous, remote or peripheral" manner will not be preempted. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983).

Despite its facial simplicity, courts have been presented with numerous questions concerning the true "breadth" of the phrase "relate[s] to". Many of these questions are presented in the case *sub judice:* (1) Is an individual's continuation and/or conversion coverage of a group ERISA policy also an "employee benefit plan" under ERISA? (2) if so, will ERISA preempt state law claims by the individual arising from allegations of fraud in the inducement and (3) if ERISA preempts the individual's state law claims, what is the proper standard of review to be applied by this Court in reviewing the administrator's denial of benefits?

ERISA section 3(1), 29 U.S.C. § 1002(1), defines "employee welfare benefit plan" as

any plan … which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan … was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise … benefits in the event of … disability. …

The determination that a plan is governed by ERISA does not turn upon the existence of a formal, written, self-contained plan; instead, "it is the reality of a plan, fund, or program … that is determinative." *Donovan v. Dillingham,* 688 F.2d 1367, 1372–73 (11th Cir.1982). Thus, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Id.* at 1373.

A distinction is made between continuation coverage and a conversion of a group policy or plan under ERISA to an individual policy. The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Pub.L. No. 99–272, Title X, § 10002(a), 100 Stat. 227 (1986) amended ERISA by requiring employee benefit plans to offer employees the opportunity to continue their coverage under the plan until, among other options, 18 months after they terminated their employment. 29 U.S.C. §§ 1161(a), 1162(1). COBRA also provided employees the option of converting their continued coverage to individual coverage at the expiration of the continued coverage. 29 U.S.C. § 1162(5).[5]

Federal courts, however, are divided on the issue of whether an individual conversion insurance policy is part of a plan established or maintained by an employer under ERISA once conversion has taken place. *Compare Vaughn v. Owen Steel Co.,* 871 F.Supp. 247 (D.S.C.1994) (Issues concerning the availability of a conversion policy, or continuation coverage, or the formation of an individual contract of insurance are all preempted by ERISA, while issues concerning a breach of that policy are not preempted by ERISA.); *Mimbs v. Commercial Life Ins. Co.,* 818 F.Supp. 1556 (S.D.Ga.1993) (While ERISA preempted claims arising from the failure to provide and verify continuation coverage and the failure to offer a proper conversion plan, ERISA did not preempt claims arising from the conversion policy itself.) *with Nechero v. Provident Life & Accident Ins. Co.,* 795 F.Supp. 374 (D.N.M.1992) (Individual conversion health insurance policy purchased by insureds following conversion of group health policy provided by insured's employer was an employee welfare benefit plan governed by ERISA.); *Beal v. Jefferson–Pilot Life Ins. Co.,* 798 F.Supp. 673 (S.D.Ala.1992) (Insured's converted policy following his termination of employment with his employer was an "employee benefit plan" under ERISA.).

In *Mimbs,* the plaintiff exercised his right to "Continuation Coverage" under his employer's group health plan following cessation of his employment; thereafter, the plaintiff allegedly elected to convert his continuation group health coverage to an individual policy following expiration of the continuation coverage period. The plaintiff then asserted various state law claims against the insurance company arising from a denial of benefits.

In reasoning that the continuation coverage was a welfare benefit plan under ERISA, the court stated:

> COBRA continuation coverage is integrally related to an ERISA plan: the statutory right to continuation coverage is predicated upon the existence of an ERISA plan, 29 U.S.C. § 1161(a); the continuation coverage must be identical to that coverage provided under the ERISA plan, *id.* § 1162(1); and modification of the plan coverage must also apply to the continuation coverage, *id.* Indeed, continuation coverage is defined as *"coverage under the plan...." Id.* at 1162 (emphasis added).

*Mimbs,* 818 F.Supp. at 1561. Thus, a claim arising from the failure to promptly pay benefits under the continuation coverage relates to an ERISA plan and is preempted by ERISA.

However, the court went on to distinguish a claim for benefits under a conversion policy stating,

> The conversion coverage itself, should the former employee elect to convert, is for an individual as opposed to a class of beneficiaries. There is no showing that the conversion coverage in this case contains the requisite elements of an ERISA plan. Furthermore, once conversion has occurred and the policy is in force, there is no longer any "integral connection" between the individual conversion policy and the ERISA plan that gave rise to the right to convert.

\*     \*     \*     \*     \*     \*

There is no showing that administering benefits under the individual conversion policy itself, once that policy is in effect, requires an ongoing program to meet the

---

5. Pursuant to 29 U.S.C. § 1161(b), COBRA continuation coverage does not apply in this action. However, the terms of the policy issued permit

continuation including a guaranteed renewability provision. (Court File No. 1, Exhibit B).

(former) employer's obligations under ERISA. The connection between a state-law breach-of-contract claim for verification of coverage and payment of benefits allegedly due under the conversion policy appears to be too "tenuous, remote, [and] peripheral" to warrant a finding that the claim under the conversion coverage relates to the ERISA plan and is pre-empted by ERISA.

*Id.* at 1562. (citation omitted).[6]

In *Nechero*, the plaintiffs elected to extend Mr. Nechero's insurance coverage, following cessation of his employment, under an option mandated by COBRA. At the expiration of this continuation coverage, the plaintiffs elected to convert the group policy to . an individual policy. The plaintiffs contracted directly with the insurance company for this conversion coverage, paying their premiums directly to the company; however, the plaintiffs did not have to provide proof of insurability or have a medical examination and were not subject to any exclusion for pre-existing medical conditions.

In holding the plaintiffs' conversion policy to be governed by ERISA, the court reasoned

> [T]he Necheros' conversion policy arose from Mr. Nechero's employment relationship with [his employer], was implemented with administrative assistance from [his employer], and was integrally connected to the group plan in which the Necheros participated when Mr. Necheros was an active employee....

*Nechero*, 795 F.Supp. at 380. *See Rasmussen v. Metropolitan Life Ins. Co.*, 675 F.Supp. 1497, 1506 (W.D.La.1987) ("plaintiffs' right to the converted policy as well as a designation of benefits to be contained therein existed solely by virtue of an ERISA employee benefit plan.").

This Court finds the reasoning set forth in *Nechero* to be more persuasive than that set forth in *Mimbs*. The Court also concludes that the weight of authority is against the decision in *Mimbs*. *See Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 408 (9th Cir.1995); *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1346 (11th Cir. 1994); *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 817 (9th Cir.1992); *Howard v. Gleason Corp.*, 901 F.2d 1154, 1157 (2d Cir.1990); *Klosterman v. Western General Management, Inc.*, 805 F.Supp. 570, 573 (N.D.Ill.1992); *Beal v. Jefferson–Pilot Life Ins. Co.*, 798 F.Supp. 673, 675 (S.D.Ala. 1992). But for his employment with the Navarre Company and his participation in an employer sponsored disability benefit program, defendant Reynolds would not have been insured with Massachusetts Casualty. This is particularly evidenced by the fact that defendant Reynolds did not have to complete additional proofs of insurability or undergo any medical examinations before receipt of his continuation coverage. Further, Reynolds' continuation privilege was a benefit of the group plan.

> The predicate to the conversion right was coverage under the group plan. If [Reynolds] had not received [disability] insurance under the group plan, [he] would not have been able to convert [his] group policy to an individual policy, and would have no cause of action arising from the conversion policy. Because [Reynolds] would not be eligible for a conversion policy without first belonging to an ERISA group plan, . . . the individual conversion policy is an extension of the ERISA plan and is governed by ERISA.

*Mays v. UNUM Life Ins. Co.*, 1995 WL 317102 (N.D.Ill. May 23, 1995) (No. 95C1168) (Conlon, J.).

▮ As such, defendant Reynolds' continuation policy is sufficiently and integrally connected with the group plan as to make it fall under the auspices of ERISA.

▮ Having determined this, the Court is now faced with the issue of whether ERISA preempts state law claims relating to allegedly wrongful conduct pre-dating the adoption of an ERISA plan. *Compare Perry v. P*I*E Nationwide, Inc.*, 872 F.2d 157 (6th Cir.1989) (common law claim of fraud in the inducement in obtaining participation in an employee welfare benefit plan and seeking rescission of plan, but *not* seeking benefits under

---

**6.** This reasoning was later adopted by the *Vaughn* court.

plan, is not preempted by ERISA), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990); *Perkins v. Time Ins. Co.,* 898 F.2d 470 (5th Cir.1990) (state law claim against insurance agent for fraudulent inducement is not preempted by ERISA, while similar claim against insurance company is preempted); *Martin v. Pate,* 749 F.Supp. 242 (S.D.Ala.1990) (claim of fraud in the inducement not preempted by ERISA), *aff'd without op.* 934 F.2d 1265 (11th Cir. 1991); *Isaac v. Life Investors Ins. Co.,* 749 F.Supp. 855 (E.D.Tenn.1990) (same); *with Farlow v. Union Central Life Ins. Co.,* 874 F.2d 791 (11th Cir.1989) (claim of fraud in the inducement preempted by ERISA); *Cromwell v. Equicor–Equitable HCA Corp.,* 944 F.2d 1272 (6th Cir.1991) (state law claim of promissory estoppel to recover benefits from plan preempted by ERISA), *cert. dismissed,* 505 U.S. 1233, 113 S.Ct. 2, 120 L.Ed.2d 931 (1992).

This Court is guided by the decision reached by the Sixth Circuit in *Perry,* which reasoned that state law causes of action alleging wrongful conduct prior to the adoption of an ERISA plan *and* seeking benefits under the plan are preempted by ERISA. Specifically, the Court, in holding that ERISA did not preempt certain of the plaintiffs' state law causes of action, stated:

> Here, plaintiffs seek a rescission of the plan and restitution of the agreed wage reduction. Neither party has cited any case indicating that § 1132 provides a remedy of the type sought by the plaintiffs. Plaintiffs, unlike the complainants in some of the cases cited or discussed above, *do not seek plan benefits;* rather they seek not to be bound as participants and thus to recoup their wage reductions.

*Id.* at 162 (emphasis added).

In this case, Mr. Reynolds is seeking specific performance under the disability insurance policy. In light of the Court's earlier analysis concerning the status of an individual's conversion policy, *infra,* this desired remedy clearly seeks plan benefits. Consequently, Mr. Reynolds'· state law causes of action are preempted.[7] In light of this preemption, the Court is now faced with the task of determining what remedy, if any, Mr. Reynolds has.

In *Coleman v. General Elec. Co.,* 643 F.Supp. 1229 (E.D.Tenn.1986), *aff'd.* 822 F.2d 59 (6th Cir.1987), this Court addressed the limited availability of remedies under ERISA. The plaintiffs in *Coleman* asserted a breach of fiduciary duty and breach of contract claim against the plan's providers arising out of previously preempted state law fraud in the inducement claims. This Court held the plaintiffs "had no viable ERISA claim against [the plan provider.]" *Isaac,* 749 F.Supp. at 862. The Court reasoned:

> [s]ince the plaintiffs were not under the ERISA plan sponsored by [the employer] at the time the alleged misrepresentations were made [the employer] did not owe the plaintiffs any fiduciary duty. [ ] "A fiduciary relationship does not exist towards potential participants in a plan and such potential participants have no standing to sue for misrepresentation and breach of fiduciary duty under ERISA. [ ]"

*Id.* (quoting *Coleman,* 643 F.Supp. at 1235) (citations omitted). *See Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 943 (6th Cir.1995) ("that ERISA does not provide the full range of remedies available under state law in no way undermines ERISA preemption.").

Again, the Court must be guided in its decision with rulings promulgated by the Sixth Circuit. As set forth in the allegations of the complaint, Mr. Reynolds is seeking relief based upon wrongful conduct which allegedly occurred prior to his actual participation in the ERISA plan at issue. Consequently, this Court is left with no other choice than to grant Massachusetts Casualty's motion for summary judgment.

---

7. In *Isaac v. Life Investors Ins. Co. of America,* this Court ruled the plaintiffs' state law causes of action relating to the defendants' fraudulent misrepresentations were not preempted because ERISA afforded no remedy to the plaintiffs. However, the plaintiffs in that cause were seeking compensatory and punitive damages incurred as a result of the alleged fraud and misrepresentation; Mr. Reynolds, on the other hand, seeks specific performance under the policy. While this may, in fact, be a distinction without a difference, given the Sixth Circuit's exact language in *Perry v. P\*I\*E,* this Court is left with no choice.

■ Even if Mr. Reynolds could state a viable claim under ERISA, there would still be no recovery of benefits in this action. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), the Supreme Court held "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan." Discretion, however, is the exception not the rule, and unless the plan clearly grants such discretion, the Court should review the administrator's actions *de novo. Anderson v. Great West Life Assurance Co.,* 942 F.2d 392, 394 (6th Cir.1991). In the case *sub judice,* Massachusetts Casualty has pointed to no term or provision of the plan granting it discretionary authority over the denial of benefits. Further, Massachusetts Casualty has presented no controlling precedent which would permit this Court to grant such authority.[8] Consequently, the Court will review the instant denial of benefits *de novo.*

■ When reviewing a denial of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), the Court considers only the evidence available to the claims administrator at the time the final decision was made, which includes what occurred during the administrative appeal process. *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991). The policy provision at issue is:

TIME LIMIT ON CERTAIN DEFENSES: (A) After two years from the date of issue of the policy no misstatements, except *fraudulent misstatements, made by you in the application* for this Policy shall be used to void the Policy or to deny a claim for loss incurred or disability; as defined in the Policy; commencing after the expiration of such two-year period . . . .

(Court File No. 16, Appendix at 11) (emphasis added). In its letter denying benefits, the company stated:

Had your true medical history been disclosed on your application as required, this policy would not have been issued[.]

We consider your full knowledge of and continuous treatment for Meniere's Disease, hearing loss and vertigo in the months immediately preceding your application for insurance with this Company and your blatant failure to disclose your full medical history on the application as required, to be "fraudulent misstatements". Accordingly, the Company is obliged to rescind your policy and disallow your claim.

(Court File No. 1, Exhibit C at 2).[9]

■ Since ERISA is silent as to the issue of the fraudulent character of the insured's omissions or misrepresentations on a disability insurance application, this Court may refer to state law for guidance. *Coots v. United Employers Federation,* 865 F.Supp. 596, 602 (E.D.Mo.1994); *Tingle v. Pacific Mut. Ins. Co.,* 837 F.Supp. 191 (W.D.La.1993). Tenn.Code Ann. § 56–7–103 (1994) provides:

**Misrepresentation or warranty will not avoid policy—Exceptions.**—No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

■ Thus, under Tennessee, the person seeking insurance has a duty to make a fair disclosure of the facts of the risk involved to the insurer. *Collins v. Pioneer Title Ins. Co.,* 629 F.2d 429, 434 (6th Cir. 1980). Further, the insured's duty of fair

---

8. While Massachusetts Casualty cites *Pierre v. Connecticut General Life Ins. Co.,* 932 F.2d 1552 (5th Cir.), *cert. denied,* 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991), as such precedent, this Court declines to follow the holding in *Pierre.*

9. Massachusetts Casualty has further submitted the Affidavit of Brian B. Wentworth, a senior claims examiner, setting forth the definitive basis for denial of coverage if an applicant has a history of Meniere's Syndrome. (Court File No. 19 at ¶ 11, 12) (Court File No. 16, Appendix at 381).

disclosure to the insurer is the same whether it is breached by giving false statements or by failing to give the full information known to the insured about matters material to the risk, provided the insurer does not otherwise know of the information. *Id.*

It is abundantly clear in the present case that material misrepresentations were made in the subject disability policy application. However, Mr. Reynolds' contends any such misrepresentations were made without his consent and are, in fact, contrary to the information given to Mr. Cofer, the insurance agent. Mr. Reynolds further contends Mr. Cofer actually misled him as to the nature of the forms, including the application form, that he signed in blank.

This case falls within the holding of *Beasley v. Metropolitan Life Ins. Co.*, 190 Tenn. 227, 229 S.W.2d 146 (1950). In *Beasley*, the agent knew of and the insured told the truth about the ill health of the insured, but the agent put false information on the application, which the insured signed without reading. The Tennessee Supreme Court barred recovery, holding:

> So, at the end of the Plaintiff's proof we have this situation: The answers to the application are admittedly false, but according to the Plaintiff's testimony, neither she nor her husband knew that those answers were false; but it cannot be doubted that if the Company had known that the answers were false, it would never have entered into the contract, nor issued the policy, so much is clear from the language of the documents which are the basis of the contract and which we quoted above in the opinion. Plaintiff says her husband signed the false application but did not read it, though there was no fraud, duress, or disability to prevent his reading it, and the plaintiff says she herself received the policy when it was delivered, but she did not read it and knew nothing about its falsity until the Company refused to pay the claim.

> The following general rules of the law of contracts are amply supported by authorities cited in American Jurisprudence and Corpus Juris Secundum:

> "To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts." 12 Am.Jur., 629. "In this connection it has been said that one is under a duty to learn the contents of a written contract before he signs it, and that if, without being the victim of fraud, he fails to read the contract or otherwise to learn its contents, he signs the same at his peril, and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence." 17 C.J.S., Contracts, § 137, pages 489, 490.

> "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law." *Upton v. Tribilcock*, 91 U.S. 45 [23 L.Ed. 203] (1875).

> The foregoing authorities deal with the phase of the law of contracts where one who has negligently signed a contract without reading it, seeks to avoid his obligation, but clearly the converse would be even more unjust and unreasonable,—that the Courts should impose an obligation, on an innocent Defendant who was led to make the contract on the careless misrepresentation of the Plaintiff and the insured. A verdict should have been directed for the Defendant on account of the misrepresentation and consequent mistake.

*See also De Ford v. National Life & Acc. Ins. Co.*, 182 Tenn. 255, 185 S.W.2d 617, 622 (1945); *Montgomery v. Reserve Life Ins.*, 585 S.W.2d 620, 622 (Tenn.Ct.App.1979) ("An insured has the duty to read the application for insurance and to verify the information therein stated."); *Giles v. Allstate Ins. Co.*, 871 S.W.2d 154, 157 (Tenn.Ct.App.1993); *Hardin v. Combined Ins. Co.*, 528 S.W.2d 31 (Tenn.Ct.App.1975).

■ Moreover, "[o]ral statements made before and at the time of the signing of the contract can not be admitted to vary the plain and unambiguous terms of a written application." *Bailey v. Life & Cas. Ins. Co.,* 35 Tenn.App. 574, 250 S.W.2d 99, 102 (1951). In *Bailey,* the insured was told by the insurance agent the coverage would take effect immediately if a cash payment was made at the time the application was executed. The insured paid less than one month's premium, and in return was given a receipt which stated, "If this sum is equal to the full first premium on the policy applied for, then. . . ." coverage will be effective immediately. In finding no coverage, the court held: "When an application for insurance plainly states the limitations upon the authority of the soliciting agent and the conditions under which the policy will become effective, the applicant is charged with the knowledge of such limitations and conditions." *Id.* 250 S.W.2d at 104.

Mr. Reynolds claims:

11. On the day when the application for the Massachusetts Casualty disability insurance was allegedly complete, I was never aware that more than the signature page was involved and in fact Cofer came into my office, came around beside my desk and showed me where to sign for the "changeover" and assured me that he would take care of having the insurance changed over. I was never aware that there was a detailed application which was completed and was never shown that application nor given the opportunity to review it. As far as I knew, the other pages (which later turned out to be other pages in the application) could have been for the other employees to sign.

12. After reviewing the printed language on the signature page of what later turned out to be the application in question, and noting that I was declaring and agreeing that the application consists of Part I and Part II, *if applicable,* and not recognizing anything on the form I had been shown to indicate that other parts were applicable or that there were any other pages containing information on me other than those pages I signed, I executed the application.

13. When I executed the application, the signature page was blank. The place and date of execution were completed later by Cofer because they are not in my handwriting and were not on the form when I signed it. As far as I know, the other pages in the application were also incomplete when I executed the document. I executed the documents upon the assurances from Cofer that our conversations had been transmitted to Massachusetts Casualty, that adequate and correct information had been given to them, and that this was merely a simple process in the changeover of the disability insurance.

14. In light of the prior changeover of our group health insurance where it was only necessary to sign a brief enrollment card which did not require answering of medical questions, I did not question the representations of Cofer regarding what was necessary to obtain the Massachusetts Casualty Insurance.

15. I had previously applied for Massachusetts Casualty disability insurance through Cofer wherein after completion of the application for the disability insurance a medical examination was made and an Equifax Investigation Report was prepared. Both of those involved asking me the names and addresses of doctors and prior medical history questions, all of which I answered truthfully. It was my understanding that the policy in question would require the same process, and therefore I believed that my medical history which I had communicated to Cofer on numerous occasions would be communicated to Massachusetts Casualty and later verified by similar examinations and reports.

\* \* \* \* \* \*

17. After the Massachusetts Casualty disability policy in question[ ] was issued, it was returned to my employer, along with the policies on the other employees and was kept at all times by my employer because my employer paid the premiums. I was never at any time given the opportunity to review the policy by the agent or my employer and in fact did not receive a copy of either the application or the policy

until after my termination in 1992 when I requested a copy of the policy to make a claim. I then discovered for the first time that the incontestable provision was less favorable than under the prior Provident policy.

(Court File No. 34, Exhibit 1, Affidavit of Ronald A. Reynolds)

The pertinent provisions of the Application provide:

The APPLICANT declares, agrees and says:

(1) That this Application consists of PART I and PART II, if applicable.

(2) That the statements and answers in this PART I:

(a) are complete and true and correctly recorded to the best of his or her knowledge and belief; and

(b) shall form a part of the policy issued in reliance on them.

(3) That he or she adopts all statements and answers in any PART II and that they:

(a) are complete and true and correctly recorded to the best of his or her knowledge and belief; and

(b) shall form a part of the policy issued in reliance on them.

(4) That except as stated in FORM 200 C1A attached to this PART I, this Application shall not be binding:

(a) until approved by the Company at its Home Office and a policy issued; and

(b) unless the full first premium has been paid.

(5) That no agent or medical examiner is authorized to do any of the following:

(a) accept risks or pass upon insurability;

(b) make, alter or modify the terms of this Application or any policy issued

thereon; or (c) waive any of the Company's rights or requirements.

The Applicant acknowledges receipt of the Notice to Applicant regarding the Investigative Consumer Report and Medical Information Bureau.

(Court File No. 1, Exhibit A).

In light of relevant law defining the obligations of the parties in connection with the execution of an application for insurance, the express terms of the application, and Mr. Reynolds' own educational background,[10] this Court finds Massachusetts Casualty's denial of benefits pursuant to the terms of the contract to be in good faith and reasonable. As stated in earlier Tennessee decisions and now adopted by this Court, it is incumbent upon an insured to review documents prior to their execution; if Mr. Reynolds had done so, the single page he signed would have revealed the true nature and implication of the document to which he affixed his signature. Further, Mr. Reynolds has presented no significant probative evidence of his inability to determine the actual nature and contents of the application and policy.[11] It would be both unfair and unreasonable to expect an insurance company, or any other party to a contract, to be bound by the terms of an agreement to which it had no knowledge of and no reason to assume applied. As such, Massachusetts Casualty's motions for summary judgment will be **GRANTED,** all claims asserted against it will be **DISMISSED WITH PREJUDICE,**[12] and judgment will enter in its favor.

In light of the dismissal of all claims against Massachusetts Casualty, that leaves Mr. Reynolds' claims against Mr. Cofer. However, the only federal question upon which this Court had jurisdiction was that raised by Mr. Reynolds' claim for benefits

**10.** Mr. Reynolds is a licensed insurance agent. While Mr. Reynolds never sold any insurance under his license and his training was for the purpose of passing the insurance licensing exam, not to sell insurance, he did possess a more detailed educational background than the average applicant. (Court File No. 34, Exhibit 1, Affidavit of Ronald A. Reynolds at ¶ 19).

**11.** In fact, Mr. Reynolds admits all the pages of the application were present when he executed

the signature page. (Court File No. 34, Exhibit 1, Affidavit of Mr. Reynolds at ¶ 11).

**12.** Since Massachusetts Casualty's declaratory judgment action has been previously consolidated with Mr. Reynolds' state court action, the Court finds it redundant to issue a declaratory judgment in favor of Massachusetts Casualty in the one case when all claims asserted against it in the other are being disposed of.

under the disability policy. As such, this Court finds itself lacking subject matter jurisdiction over Mr. Reynolds' remaining claims against Mr. Cofer. Consequently, pursuant to 28 U.S.C. § 1447(c), the remainder of this action (No. 95–160) will be **REMANDED** to state court for further disposition.

An order will enter.

### *ORDER*

For the reasons set forth in the accompanying memorandum, the motions of Massachusetts Casualty Insurance Company for summary judgment (Court File No. 16) (No. 94–194) and (Court File No. 7) (No. 95–160) are hereby **GRANTED.** All claims asserted by defendant Ronald A. Reynolds are hereby **DISMISSED WITH PREJUDICE.** Judgment is hereby **ENTERED** on behalf of Massachusetts Casualty in the amount of $6,568.62 plus interest. Case No. 94–194 is now moot.

Case No. 95–160 is hereby **REMANDED** to the Hamilton County Circuit Court with respect to any and all claims asserted by Ronald A. Reynolds against Mr. Joseph P. Cofer, Jr.

**SO ORDERED.**