**Gerald DINGLEDINE, et al., Plaintiffs,**

**v.**

**CENTRAL RESERVE LIFE INSURANCE COMPANY, Defendant.**

**Civil Action No. C–1–94–71.**

United States District Court, S.D. Ohio, Western Division.

June 5, 1996.

William Paul Schroeder, Lawrence Edward Barbiere, Schroeder Maundrell Barbiere & Powers, Cincinnati, OH, for Gerald Dingledine.

William Paul Schroeder, Schroeder Maundrell Barbiere & Powers, Cincinnati, for Dingledine Basic Materials Inc.

Lawrence Alan Flemer, Dinsmore & Shohl, Cincinnati, OH, for Central Reserve Life.

ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 22); (2) DENYING PLAINTIFF'S CROSS SUMMARY JUDGMENT MOTION (DOC. 19); (3) THEREFORE GRANTING JUDGMENT IN DEFENDANT'S FAVOR; AND (4) TERMINATING THIS CASE UPON THE DOCKET

SHERMAN, United States Magistrate Judge.

This consent case, brought under the Employee Income Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, concerns whether defendant Central Reserve Life Insurance Company ("CRLI")—in violation of the terms of its 1992 group health insurance policy (*i.e.*, its welfare benefits plan, or "Plan") with plaintiff Dingledine Basic Materials, Inc. ("DBM")—improperly denied health insurance coverage to DBM's president, co-plaintiff Gerald Dingledine.[1] *See generally Green v. Corporate Group Sys.*, No. 95–1–26, 1996 WL 180181, at *3 (6th Cir. Apr. 12, 1996) (per curiam) (citing 29 U.S.C. § 1132(a)(1)(B)).

CRLI cancelled Dingledine's policy believing that he provided false and/or misleading medical information—both written and oral—during the insurance application process. Specifically, CRLI contends that Dingledine failed to disclose that he suffered from multiple medical impairments including achalasia, a disorder of the esophagus causing repeated nocturnal vomiting. Arguing that his application responses were sufficient, and his benefits denial therefore improper, Dingledine seeks recovery of more than $100,000.00 in unreimbursed medical bills for, *inter alia*, surgery to correct his achalasia.

Now at issue are the parties' cross motions for summary judgment, as supplemented pursuant to Court Order.[2] In ruling on such motions, the Court's inquiry is whether the material facts are genuinely disputed, and either party entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). For the reasons that follow, the Court finds that: (1) Dingledine made material omissions and/or false statements to CRLI, upon which CRLI relied; and (2) pursuant to the Plan, CRLI was entitled to retroactively terminate Dingledine's benefits coverage. Summary judgment is therefore entered in favor of CRLI, and against Dingledine and DBM.

## I. Undisputed Facts

For summary judgment purposes, three sets of undisputed facts are relevant: (1)

---

**1.** Since Dingledine suffered the loss at issue, there is no dispute that he has standing to bring an ERISA reimbursement claim against CRLI. 29 U.S.C. § 1132(a)(1)(B). *See generally Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). The Court questions, on the other hand, whether DBM has standing to sue CRLI: not only did DBM apparently not suffer an injury in fact; but it is merely Dingledine's employer, and not also a Plan participant, beneficiary or fiduciary. *See* 29 U.S.C. § 1132(a); *cf. Saramar Aluminum Co. v. Pension Plan for Employees of Aluminum Indus.*, 782 F.2d 577, 580–81 (6th Cir.1986). In a recent filing, plaintiffs concede as much, and appear to voluntarily dismiss the claims plead on behalf of DBM. Doc. 41 at 2.

The merits of this issue need not be reached, however, since the Court finds that summary judgment should be entered against the ERISA claim at issue in this case, no matter which plaintiff or plaintiffs plead the claim. *See infra.*

**2.** *See* docs. 19 (plaintiffs' motion for summary judgment), 32 (CRLI's opposition memorandum), 34 (plaintiffs' reply); and docs. 22, 24–30 (CRLI's cross summary judgment motion and affidavits in support), 33 (plaintiffs' opposition memorandum), 35 (CRLI's reply). *See also* docs. 40 (Order requiring the parties to supplementally brief their motion papers), 41 (plaintiffs' supplemental memorandum), 42 (CRLI's supplemental memorandum).

Dingledine's medical history; (2) his relaying of that history to CRLI for the purpose of obtaining health insurance benefits; and (3) CRLI's issuance to, and cancellation of, Dingledine's health insurance policy.

### A. Dingledine's Medical History

It is undisputed that Dingledine has suffered from quite significant medical conditions throughout his life including, as a child, a blood clot requiring brain surgery. Six of Dingledine's more recent medical conditions now merit discussion: (1) muscle and joint pain in his knees and legs; (2) headaches and nausea; (3) kidney disorders; (4) respiratory impairments, such as pneumonia; (5) achalasia; and (6) an inguinal (*i.e.,* groin area) hernia.

*Muscle and Joint Pain*

From 1979 to 1989, Dingledine was repeatedly treated for pain in one or both of his legs. Doc. 22, ex. A at 1, 3, 7. On one occasion, the pain was so severe that Dingledine reported he could "hardly stand it." *Id.* at 3. During this period, he complained as well of knee and elbow pain, and a loss of grip strength. *Id.* at 2. On March 11, 1992, the day before he completed his health insurance application, Dingledine complained of knee pain in both legs which felt like "an ice pick." *Id.,* ex. H at 2. On this latter date, the pain was severe enough to warrant the injection of an anti-inflammatory agent. *Id.*

*Headaches and Nausea*

From 1979 until at least 1988, Dingledine frequently complained to his treating physician of having both headaches and nausea. *See, e.g., id.,* ex. A at 1–3, 5.

*Kidney Disorders*

Dingledine has complained of kidney disorders since 1958, when he was just a teenager. *Id.,* ex. B at 1–2. Those disorders caused his hospitalization thereafter on multiple occasions. *Id.* at 3, 7; *id.,* ex. E at 1–6. In addition, he sought treatment in 1987, and again in 1991, for urination-related problems. *Id.,* ex. A at 4, ex. H at 1.

*Respiratory Impairments*

Dingledine's pneumonia and related respiratory impairments also date from the 1950's. *Id.,* ex. C. They, too, are the source of his multiple hospitalizations. *See, e.g., id.* at 14. In 1991, Dingledine admitted to an evaluating physician that he occasionally still suffers from pneumonia. *Id.,* ex. F. at 2, 4.

*Achalasia*

From the age of approximately fifteen onward, Dingledine suffered from achalasia, causing him to vomit while sleeping. *Id.,* ex. D at 1. This condition occurred approximately once every two to three months. Dingledine dep. at 140. To lessen the vomiting, Dingledine began sleeping, in the mid-1970's, in an elevated fashion using extra pillows, a routine he was continuing at the time of his application signing. *Id.* at 151–52. Although he was evaluated for the purpose of surgically correcting this condition, *see* doc. 22, ex. C at 11, he declined to have the surgery. Accordingly, at the time he completed his CRLI application, Dingledine still suffered from achalasia. *See, e.g., id.,* ex. F. at 1.

*Hernia*

Because Dingledine disclosed his hernia to CRLI, *see* Dingledine dep., ex. 1 at 1, that condition—surgically corrected prior to his CRLI application, doc. 30 (Brunckhorst aff.) at 2—is not at issue here.

### B. Dingledine's Disclosure of his Medical History

Although the DBM employees were to be insured as a group, CRLI required each employee to complete both an individual insurance application and a related health history questionnaire. It was CRLI's standard procedure to then confirm, by telephone interview, the information contained in the two written forms.

### (i) Application and Signature Page

In his CRLI application, completed March 12, 1992, Dingledine was asked a total of six questions, three of which read as follows:

3. During the past FIVE YEARS, have you or any of your dependents consulted, been examined or treated by a doctor or other health care practitioner[,] or been hospitalized or operated on[,] for any conditions other than [heart disease, circulatory disorder, stroke, anemia, birth defect or

disorder, liver disorder, multiple sclerosis, cerebral palsy, cancer, paralysis, deformity, amputation, pneumocystis carinii pneumonia, Kaposi's Sarcoma, AIDS, AIDS Related Complex, HIV–positive blood test results]?

\*   \*   \*   \*   \*   \*

4. Are you ... currently under a doctor's care[,] or taking medication?

\*   \*   \*   \*   \*   \*

6. Have you ... EVER been treated for, diagnosed with[,] or consulted with a doctor for any of the following medical conditions?

> Arthritis/Disorders of the back, knees, bones, muscles, ligaments, tendons, cartilage, joints[;]
> Hernia[;]
> Kidney/bladder/prostate   disorders[;] [or]
> Asthma, bronchitis, or any other respiratory disorders... :

Dingledine dep., ex. 1 at 1–2 (capitalization in original). None of Dingledine's answers to the three questions can be classified as a good faith response. In answering question three, for example, Dingledine simply responded that he had a left inguinal hernia, which had been surgically corrected leading to a full recovery. He did not disclose his muscle and joint pain, headaches and nausea, kidney disorders, or achalasia, each of which merited his medical consultation, examination or treatment within the prior five-year period, i.e., between March 12, 1987 and March 12, 1992. See Brunckhorst aff. at 2–3. Dingledine also answered "no" to question four, when he should have revealed, at minimum, his achalasia, a condition for which he then sought repeated medical treatment, and for which surgery had been recommended for more than twenty years.[3] Regarding question six, Dingledine circled just "hernia," although he should have also circled each of the other items, as he had been treated for disorders of his knees and/or muscles, kidneys, and respiratory system.

Dingledine's application also contained a signature page, which provided in relevant part:

> READ EACH STATEMENT AND SIGN BELOW
>
> I represent that, to the best of my knowledge and belief, all answers given in this application are accurate, complete and true. I understand [CRLI] is relying on my answers in deciding whether to approve this application[,] and that full and complete disclosure of the requested health information must occur for insurance to go into effect.... [I further understand that] if I omit any of the requested health information, no insurance will go into effect for myself or my dependents. I understand [as well that] the agent [selling me this policy] has no authority to alter or waive this, or any other condition of coverage.

Dingledine dep., ex. 1 at 3 (marked as "CRL B 0324") (capitalization in original). Despite these warnings and his failure to provide accurate medical information, Dingledine signed the application.

**(ii) CRLI Health History Questionnaire**

At the very beginning of the six-page questionnaire, Dingledine was advised as follows:

> *All questions related to the medical condition(s) must be answered in detail. The applicant's doctor should be contacted if the applicant is unsure about the answer to any of the questions.*
>
> BY SIGNING BELOW, I HEREBY CERTIFY THAT ALL OF THE FOLLOWING HEALTH HISTORY STATEMENTS/ANSWERS PROVIDED TO QUESTIONS 1 THROUGH 19 ARE TRUE AND ACCURATE[,] AND I AGREE THAT THEY SHALL BECOME A PART OF THE APPLICATION....

*Id.* at 5 (marked as CRL B 0326) (emphasis and capitalization in original). Dingledine signed the questionnaire, despite the fact that he left blank (and therefore did not

---

**3.** Dingledine had his achalasia surgically repaired in October 1992, just seven months after he completed his CRLI application. *See* doc. 19, ex. H at 1. At that time, two of his other recurring medical problems, pneumonia and kidney stones, were again in need of medical attention. *Id.*

answer) specific questions concerning his muscle and joint disorders (question one, with multiple subparts), and kidney disorders (question fourteen, also with multiple subparts).[4] Nothing in the record suggests that he was puzzled by the questions, and therefore called his doctor.

### (iii) Verification Phone Call

Dingledine was advised on the signature page of his application that:

> [CRLI] will acknowledge [your] application for health insurance with a verification telephone call.... [T]his call takes approximately ten minutes and is a routine process for those applying for coverage with [CRLI]....

*Id.* at 3 (marked as CRL B 0324). Dingledine's verification phone call was recorded, as he agreed; a transcript is attached to his deposition. *See id.,* ex. 4.

In that call, Dingledine was orally asked each of the six questions constituting his application. He answered just as he did in the application, and thereby made the same omissions and false statements all over again. Of particular significance is the fact that, at the end of the phone call, Dingledine was specifically given an opportunity to change his mind, and provide honestly responsive answers. But, he did not. The conversation at that point went as follows:

> CRLI Agent: Is there any other medical information or medical condition that have not been discussed [in this phone call] or provided for on the application?
>
> Dingledine: None that I can think of.... [I'm] [p]retty healthy, I think.

*Id.* at 4.[5] Whether viewed objectively or subjectively, this statement is far from accurate, given the fact that, by his own admission, (1) Dingledine was then still vomiting in

his sleep, as he had done since he was fifteen years old; (2) the vomiting was caused by a defective pouch in his esophagus, *i.e.,* achalasia; (3) the condition required him to sleep, on a daily basis, supported by three or four pillows; and (4) were he to stop using the pillows, his vomiting would increase. Dingledine dep. at 152, 185, 189.

### C. Policy Issuance and Cancellation

Relying on Dingledine's verbal and written assertions, CRLI issued a health insurance policy to him effective April 1, 1992. Doc. 24 (Parente aff.) at 2 & ex. C at 1; doc. 25 (Szoly aff.) at 1. Following multiple hospitalizations shortly thereafter, in June through October 1992, CRLI began an investigation into the accuracy of Dingledine's application materials. Parente aff., ex. C at 1. Having found, as a result of that investigation, that Dingledine suffered from, but failed to disclose to CRLI, multiple medical conditions— including (1) achalasia, (2) kidney stones requiring treatment as many as four times, and (3) years of knee pain (for which Dingledine was treated, as noted, the very day before he completed his insurance application)—CRLI retroactively determined that no policy had ever gone into effect. *Id.* at 3. Dingledine, through counsel, was so advised on February 3, 1993; his submitted claims were then denied, and his $1,080.00 paid in premiums returned to him. *Id.*

### II. Applicable Law

### A. *De Novo* Standard

As both parties agree, the Plan administrator is CRLI. Doc. 41 at 4; doc. 42 at 3. Because the Plan language does not clearly provide CRLI with the discretionary authority to determine whether Dingledine is eligible for benefits, *see* Parente aff., ex. A at

---

4. Question 1, for example, required Dingledine to explain, *inter alia,* his specific muscle/joint/knee condition; the condition's onset date; the type, frequency, and date of his treatment; and the medication he was then taking. Dingledine dep., ex. 1 at 5 (marked CRL B 0326). Similarly, for Question 14, Dingledine was asked to set forth the onset date of his kidney condition; his treatment and symptoms; and whether he had a family history of kidney disease. *Id.* at 9 (marked as CRL B 0329). As noted, Dingledine answered none of these questions.

5. While "healthy" is, undoubtedly, a relative term, there is no question in the Court's mind that Dingledine's use of the term "pretty healthy" to describe his then-state of health is misleading at best. Nor is Dingledine's supposed ignorance of medicine an excuse for his misleading telephonic statements; as a high school graduate, *see* Dingledine dep. at 13, he must surely be held to know at least this much.

1–2 (§ 8, Condition for Coverage), CRLI's benefits denial need not be deferred to,[6] and that denial is reviewed *de novo. Lake v. Metropolitan Life Ins. Co.,* 73 F.3d 1372, 1376 (6th Cir.1996) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989)). In conducting that *de novo* review, the Court "must consider documents reflecting activity during [CRLI's] administrative appeals process as well as those in existence at the time of [its] initial denial of benefits." *Michele v. NCR Corp.,* No. 94–3518, 1995 WL 296331, at *2 (6th Cir. May 15, 1995) (per curiam). *See also Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991).

## B.  Interpretation of Plan Language

■ To determine the appropriateness of CRLI's termination decision, the Court need review the Plan language upon which CRLI relied. In the Sixth Circuit, straightforward and literal Plan language is given its natural meaning, unless public policy considerations "dictate a different course." *Criss v. Hartford Accident & Indem. Co.,* No. 91–2092, 1992 WL 113370, at *5 (6th Cir. May 28, 1992) (per curiam).

## III.  Analysis

■ At the time it decided to terminate Dingledine's policy and later, on administrative appeal of that decision, CRLI had before it the following documentation, among other evidence:

—Medical records from James Thomson, D.O. revealing that Dingledine was treated for his knee pain the very day before he completed his CRLI application;

—Hospital records and x-rays, commencing in the 1960's, demonstrating in detail Dingledine's longstanding, uncontrolled achalasia; and

—Notes from treater Rolf Brunckhorst, M.D. in which Dingledine admitted, within five years prior to his application signing,

that he periodically suffered from pneumonia.

Parente aff. at 3 & ex. D at 1–2. With respect to omissions and false statements by applicants, the Plan provided in relevant part as follows:

Section 8 *Condition for Coverage*

1.  As a condition for and precedent to [obtaining this] insurance . . . [,] [an insurance applicant] must not have received Medical Care.  [ ]Medical Care means hospitalization, surgery or consultation, examination or treatment by a doctor within five (5) years prior to the date of his or her application.  If a person to be insured has received such Medical Care, then such person is not covered for insurance, and no insurance will go into force for that person even though a certificate of insurance was issued for that person . . . .

2.  This Condition for Coverage will not operate provided such Medical Care is:

  a.  Fully disclosed on the [applicant's] application; or

  b.  [D]etermined by [CRLI] not to be material to the risk.

3.  This Condition for Coverage will operate even though any or all of the following events have occurred:

  a.  Evidence of insurability has been furnished;

  b.  Insurance has been approved;  and

  c.  Benefits have been paid.

\*    \*    \*    \*    \*    \*

5.  [If the applicant makes a] disclosure on the application of some but not all [relevant Medical Care], such Medical Care, regardless of the reason or cause for the lack of full and complete disclosure, will not waive the operation of this Condition for Coverage.

*Id.,* ex. A at 1–2 (capitalization added and deleted).  In a later section, the Plan also provided:

---

**6.** In the alternative, if such discretion were somehow to be found in the language of Dingledine's policy with CRLI, so that the Court need instead review Dingledine's benefits cancellation under the more deferential "abuse of discretion"

standard, *Firestone,* 489 U.S. at 114, 109 S.Ct. at 956, CRLI—for the reasons made clear below—did not abuse its discretion by denying Dingledine's benefits claims, and retroactively cancelling his Plan participation.

*Section 15 [CRLI's] Right to Cancel or Rescind because of Fraud or Misrepresentation*

[CRLI] reserves the right to cancel or rescind the coverage of an insured person ... in the event of [that person's] fraud or misrepresentation [as evidenced in the person's] ... applying for coverage ... [or] telephone verification [with us]....

*Id.,* ex. B at 1 (capitalization added and deleted).

Having fully and carefully reviewed these straightforward and plain meaning terms, the Court finds no public policy reason to construe this Plan language other than as it literally reads.[7] *Compare Criss,* at *5. Pursuant to that language, and the medical evidence reviewed by CRLI, the Court finds that Dingledine did not satisfy the conditions precedent to CRLI providing him with health insurance coverage pursuant to the Plan. Accordingly, CRLI was well within its rights, and acting reasonably pursuant to the Plan, when it retroactively terminated Dingledine's coverage, and denied his benefits claims. *Cf. Miller, supra,* 925 F.2d at 985. Summary judgment should therefore be entered in favor of CRLI.

██ This conclusion is reinforced by a reading of Ohio Rev.Code § 3923.14, the statutory provision applicable in Ohio to false statements provided in insurance applications. While the Court is not bound by state law in interpreting ERISA—it is bound, instead by federal law—the Court has the discretion to review "relevant state law approaches" concerning insurance contract interpretation for the narrow purpose of developing federal common law in this ERISA area. *Criss,* at *3. *See, e.g., Reynolds v. Massachusetts Casualty Ins. Co.,* 900 F.Supp. 915, 924 (E.D.Tenn.1995) (applying Tenn.Code Ann. § 56–7–103, a state insurance misrepresentation statute, to an ERISA claim). Section 3923.14 provides in part:

The falsity of any statement in the application for any policy of sickness and accident insurance shall not bar the right to recovery thereunder ... unless ... such false statement [1] is willfully false, [2] ... fraudulently made, [3] ... materially affects either the acceptance of the risk or the hazard assumed by the insurer, [4] ... induce[s] the insurer to issue the policy, and that [5] but for such false statement[,] the policy would not have been issued.... [8]

The elements of § 3923.14, though not binding upon the Court, are satisfied. Because Dingledine knew, in light of his lengthy and undisputed medical history, that the application materials he provided to CRLI were false, both the "willfully false" and "fraudulently made" prongs of the § 3923.14 test are satisfied. *Golden Rule Ins. Co. v. Michnay,* Nos. 90–3276, 90–3291, 1991 WL 112810, at *4 (6th Cir. June 26, 1991) (per curiam). Moreover, those materials, and the omissions/false statements contained therein, both materially affected CRLI's acceptance of the risk of insuring Dingledine, and induced it into doing so. Szoly aff. at 1. Finally, but for Dingledine's omissions and false statements, CRLI would not have issued him the subject policy. *Id.* at 2–3. *Accord* doc. 26 (Benson aff.) at 2; doc. 27 (Woods aff.) at 2; doc. 28 (Keaton aff.) at 2; doc. 29 (Piko aff.) at 2.

## IV. Conclusion

Having therefore found that CRLI did not violate ERISA by denying Dingledine's benefits claims and cancelling his health insurance, the Court **DENIES** Dingledine's summary judgment motion (and that of co-plaintiff, DBM, to the extent DBM has standing); **GRANTS** CRLI's cross summary judgment motion; **ENTERS JUDGMENT**

---

**7.** If anything, public policy favors the language of these terms, as the terms require insurance applicants to be honest in their applications. Based on such honesty, insurance companies can more accurately assess the risks faced by their insureds.

**8.** Eliminated from this quoted language is § 3923.14's "clear and convincing" evidentiary standard, *see Thompson v. New York Life Ins. Co.,* 1989 WL 148033, at *4 (Ohio Ct.App. Dec. 4, 1989), which the Court finds inapplicable here. *Compare Criss,* at *2. Nonetheless, were this standard to apply, and the burden to rest with CRLI, *Golden Rule Ins., infra,* 1991 WL 112810, at *4, it would be satisfied by the facts of this case.

in favor of CRLI; and **TERMINATES** this case upon the docket.

**IT IS SO ORDERED.**